NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 9, 2007
Decided August 1, 2007

**Before**

Hon. FRANK H. EASTERBROOK, *Chief Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 06-2541

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    *Plaintiff-Appellee,*<br><br>    *v.*<br><br>QUINTUS ROYAL,<br>    *Defendant-Appellant.* | Appeal from the United States<br>District Court for the Northern<br>District of Illinois, Eastern Division.<br><br>No. 04 CR 863<br><br>Joan B. Gottschall,<br>*Judge.* |

**O R D E R**

The jury convicted Quintus Royal of two counts of distributing a controlled substance and completed special verdict forms which indicated that at least fifty grams of crack cocaine were involved in each count. Relying on the jury's special findings, the district court sentenced Royal to the statutory mandatory minimum of 240 months' imprisonment. Royal now appeals his convictions and sentence. Because the district court properly relied on the jury's special verdict findings in sentencing Royal to the enhanced penalties for crack cocaine, we affirm the judgment of the district court.

## I. BACKGROUND

Royal's convictions arose from his sale of crack cocaine on two occasions in the spring of 2004. Both transactions were arranged and audio recorded by Frederick Watkins, a confidential informant for the Drug Enforcement Administration. On March 23, 2004, Watkins told Royal, "[m]y man want to buy a couple ounces." Watkins explained that his supplier was charging $800 per ounce, to which Royal replied, "I can give it to you for 750 an ounce." Later in the conversation, Watkins clarified that he "want[ed] it rocked up," and Royal agreed, "[i]t gonna be rocked."

A week later, Watkins met Royal to complete the first transaction. Watkins paid Royal $1500 for two ounces of cocaine, which Royal said he had "cooked . . . up" the night before. The second transaction occurred on April 9, 2004. This time Officer Daniel Allen, an undercover officer with the Chicago Police Department, accompanied Watkins to the meeting point, where Watkins paid Royal $1500 and Royal handed two ounces of cocaine to the officer. For his acts, Royal was charged with two counts of knowingly and intentionally distributing controlled substances, namely, mixtures containing crack cocaine, in violation of 21 U.S.C. § 841(a)(1).

At trial, the major issue was whether Royal distributed crack cocaine or some other controlled substance. To establish the identity of the substances, the government offered evidence regarding the substances' chemical properties. Robert Krefft, a DEA senior forensic chemist, detailed the battery of chemical tests that he conducted on the drugs. Krefft testified that two of the tests he performed, the "ether solution sample" and infrared-spectrum tests, showed the presence of cocaine base. He also testified that the weights of the controlled substances recovered during the first and second transactions were 54.7 and 52.2 grams.

The government also played recordings of conversations between Watkins and Royal and offered witness testimony to explain the terms used during those conversations. Specifically, Watkins testified that on March 23, 2004, when he told Royal that an acquaintance wanted to "buy a couple ounces," he was referring to crack cocaine. He also testified that when he asked that the cocaine be "rocked up," he meant that he wanted "no powder fashion," but "one solid rock." Sergeant George Karuntzos of the Chicago Police Department's Narcotics Section, the lead agent on the case, testified that he had never heard the term "rock" used to describe drugs other than crack cocaine. During Sergeant Karuntzos's testimony, the government played several audio recordings of conversations between Watkins and Royal, in which the two used terms such as "rocked up," "all hard," and "cooked . . . up." Narcotics expert Lieutenant Robert Coleman confirmed that the price paid to Royal for the drugs was within the range of prices for crack cocaine. In addition, witnesses with substantial knowledge of crack cocaine--Watkins, Officer Allen, Chicago Police Department Officer Laurence Coleman, and narcotics expert Robert Coleman--all testified that the drugs appeared to be crack cocaine. Royal did not introduce any evidence, but countered the government's case by cross-examining the government about the differences between

powder cocaine, crack cocaine, and other forms of cocaine base, and alluding to the possibility that the drugs were a non-crack form of cocaine.

At the close of trial, the district court instructed the jury that the defendant had been charged in the indictment with "the crime of knowingly and intentionally distributing a controlled substance." The court explained that "[t]o sustain the charge of distributing a controlled substance as charged in Count One and Count Two of the indictment," the government had to prove, beyond a reasonable doubt, that "the defendant distributed mixtures containing a controlled substance . . . [and] knew the substance was a controlled substance." The instructions noted that "mixtures containing crack cocaine, cocaine base, and cocaine" were controlled substances.

The judge supplied the jury with general and special verdict forms for each count. The general verdict form asked the jury to decide whether Royal was guilty on Counts One and Two. The court directed the jury that it should only complete the special verdict form pertaining to a particular count if it found the defendant guilty as to that count. The special verdict forms then asked the jury to determine the type and amount of controlled substance involved in each count and included four options. One option permitted the jury to find that the defendant distributed "[n]o amount" of crack cocaine. Before sending the jury to deliberate, the court reviewed the special verdict form, reiterating that the jury was free to determine that the defendant had distributed "no amount" of crack cocaine.

During their deliberations, the jury asked the judge: "Is it important to determine that it is a controlled substance or that it is crack cocaine? (as said in the indictment versus judge instructions)." After obtaining defense counsel's approval, the court instructed the jury that "[t]he law you must follow is set out in the instructions, not in the indictment." The jury found Royal guilty on both counts, and indicated on the special verdict forms that "the amount and type of the controlled substance that . . . [Royal] distributed has been proved beyond a reasonable doubt to be [a]t least 50 grams or more of . . . crack cocaine" for both counts. Royal, who had been previously convicted of possessing a narcotic with intent to distribute, objected to the application of the mandatory minimum sentence associated with crack cocaine convictions. The court rejected Royal's arguments, adopted the jury's findings as to drug type and amount, and sentenced Royal to the statutory minimum of 240 months' incarceration on each count, with the two sentences to run concurrently. Royal appeals his convictions and sentence.

## II. ANALYSIS

A.    Interplay Between the Indictment, Jury Instructions, and Special Verdict Form

Royal first argues that the district court erred in relying on the jury's special findings as to drug type and amount in sentencing him to the enhanced penalties for crack cocaine set forth at 21 U.S.C. § 841(b). Specifically, he contends that the jury's special verdict findings were the result of a confusing interplay between the

indictment, jury instructions, special verdict form, and the judge's response to a question during deliberations, and were therefore unreliable. Royal constructs this argument based on the fact that the indictment and special verdict form refer to "crack cocaine," while the judge's oral instructions directed the jury to determine whether Royal had distributed a controlled substance. This incongruity, he believes, may have led the jury to assume its obligations were solely to determine whether Royal possessed a controlled substance, and if so, to insert the weight of the controlled substance on the special verdict form.

To the extent that Royal argues, as he did at trial, that the district court's instructions misstated the elements of a § 841(a)(1) offense, we review that legal argument de novo. *See United States v. Murphy*, 469 F.3d 1130, 1137 (7th Cir. 2006). However, Royal has waived his right to challenge the special verdict form and the judge's reply because he stated that he had no objection to the special verdict form and agreed with the court's decision to respond to the jury's question and with the content of that response. *See United States v. Gonzalez*, 319 F.3d 291, 298 (7th Cir. 2003) (holding that the defendant waived his objections to the jury instructions by stating that he had "no objection" to them); *see United States v. Parker*, 469 F.3d 1074, 1079 (7th Cir. 2006) ("Waiver is the intentional relinquishment and abandonment of a known right, which precludes appellate review."). Finally, we review for plain error Royal's argument that the interplay between the indictment, jury instructions, special verdict form, and the judge's response to the jury's inquiry might create confusion, because he did not raise this issue in the district court. *See United States v. Davis*, 471 F.3d 783, 786 (7th Cir. 2006) ("Generally, issues raised for the first time on appeal are reviewed for plain error.").

We begin with Royal's argument that the district court erred in instructing the jury to return a conviction if it found that the defendant had distributed a "controlled substance." Although the defendant would have liked the court to instruct the jury that, in order to convict, it had to find that he distributed crack cocaine, no such obligation exists. The government charged Royal with violating 21 U.S.C. § 841(a)(1), which makes it unlawful for a person to knowingly or intentionally distribute a "controlled substance" unless authorized by the statute. Although the indictment identified crack cocaine as the particular controlled substance distributed, the precise identity of the controlled substance is not an element of a § 841(a)(1) offense. *See United States v. Knight*, 342 F.3d 697, 710 (7th Cir. 2003). As such, the district court's instructions clearly conveyed to the jury that to find Royal guilty of the crime charged in the indictment, it needed only to conclude that he had distributed a controlled substance.

We are not convinced by Royal's additional contention that the indictment, instructions, special verdict form, and the judge's response to the jury's question combined to hopelessly confuse the jury. Royal claims that when the jury asked the judge "[i]s it important to determine that it is a controlled substance or that it is crack

cocaine? (as said in the indictment versus the jury instructions)," the jury was expressing confusion as to its obligations in completing the special verdict form. According to Royal, when the court responded by telling the jury to follow the jury instruction--which told the jury that in assessing guilt, it needed only to determine whether Royal distributed a controlled substance--the jury reached the mistaken impression that it did not need to make a determination of drug type on the special verdict form. This argument is speculative. On its face, the special verdict form expressly asked the jury to determine the "amount and *type* of the controlled substance that the defendant distributed . . . ." (Emphasis added). If the jury believed that the defendant distributed a substance other than crack cocaine, they would have checked the line indicating that they found that Royal had distributed "[n]o amount of a mixture containing cocaine base in the form of crack cocaine." Furthermore, when polled by the district court, each juror affirmed the special findings. Therefore, we reject Royal's contention that the special findings were the product of confusion.

B.      Sufficiency of the Evidence

Royal also claims that the jury's finding of drug type is unreliable because the evidence was insufficient to show that he distributed crack cocaine. When faced with a sufficiency of the evidence challenge, this court considers the evidence in the light most favorable to the verdict, reversing only if the record is devoid of evidence from which a jury could have found guilt beyond a reasonable doubt. *United States v. Craft*, 484 F.3d 922, 925 (7th Cir. 2007).

In an argument that borders on frivolous, Royal contends that the government failed to provide any credible evidence that the substance he distributed was crack cocaine. Because the enhanced penalties set forth in § 841(b) only apply to crack cocaine, and not other forms of cocaine, *United States v. Booker*, 70 F.3d 488, 494 (7th Cir. 1995), Royal argues for a reduced sentence. However, this argument fails because the government offered ample evidence that Royal distributed crack cocaine, not another form of cocaine.

First, the government's evidence established that the substance distributed was a form of cocaine base. Specifically, DEA senior forensic chemist Robert Krefft testified that the "ether solution sample" and infrared spectrum tests indicated that Royal's drugs were cocaine base. Royal did not contest those results, and those results eliminate the possibility that the cocaine distributed by Royal was cocaine salt--a substance that, like crack cocaine, can take a rock-like form. *See* U.S. Sentencing Comm'n, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* 7-30 (Feb. 1995) (detailing the differences between powder cocaine and forms of cocaine base).

Second, the government proved that Royal distributed crack cocaine rather than another form of cocaine base by "offering testimony from people familiar with the drug, including those who sell or use crack, since they are the real experts." *United States v. Anderson*, 450 F.3d 294, 301 (7th Cir. 2006). Watkins, Officer Allen, Officer

Laurence Coleman, and narcotics expert Robert Coleman, all individuals with substantial knowledge of crack cocaine, testified that the drugs involved in both transactions appeared to be crack cocaine. In particular, Lieutenant Robert Coleman testified that the drugs had the color, hardness, rock-like conformation, and odor of crack cocaine.

Finally, the circumstances surrounding the drug transactions provide additional compelling evidence of the drugs' identity. Recordings played at trial revealed that during their conversations, Watkins and Royal used common references to crack cocaine. At their first meeting, Watkins asked that the cocaine be "rocked up" and Royal agreed by saying that "[i]t gonna be rocked." During the first drug deal, Royal told Watkins that he had "cooked . . . up" the cocaine. Narcotics expert Robert Coleman testified that "rock" is a common code word used by drug dealers to refer to crack cocaine and that "cooking up, or rocking up, or cooking" identifies the process of making crack cocaine. Sergeant Karuntzos affirmed that "rock" refers to crack cocaine, and Watkins explained that "rocked-up" cocaine is cocaine that has been cooked into a rock fashion, known as "crack." Taken as a whole, the trial evidence was more than sufficient to support the jury's finding that Royal distributed crack cocaine.[1]

C.      Void-for-Vagueness Challenge

Royal's final argument, that the meaning of "cocaine base" in § 841(b) is unconstitutionally vague, need not detain us long. According to Royal, our decade-old conclusion that "cocaine base" as used in § 841(b) means "crack cocaine," *Booker*, 70 F.3d at 494, does not cure 841(b)'s ambiguity, because the meaning of "crack" is itself ambiguous. In making this argument, Royal attacks the various methods by which courts distinguish crack cocaine from other forms of cocaine.

To survive a vagueness challenge, "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *United States v. Collins*, 272 F.3d 984, 988 (7th Cir. 2001). Unless a vagueness argument implicates First Amendment interests, the vagueness challenge is "examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Collins*, 272 F.3d at 988. Because this case does not invoke First Amendment rights, we assess only whether the definition of "cocaine base" in § 841(b) is vague as applied in the defendant's case.

---

[1]In light of our conclusions that the jury's finding of drug type was not the product of confusion and was supported by sufficient evidence, we reject Royal's argument that the court had an independent obligation to make a finding as to drug type at sentencing. *See United States v. Rivera*, 411 F.3d 864, 866 (7th Cir. 2005) ("Once the jury has spoken, its verdict controls unless the evidence is insufficient or some procedural error occurred; it is both unnecessary and inappropriate for the judge to reexamine, and resolve in the defendant's favor, a factual issue that the jury has resolved in the prosecutor's favor beyond a reasonable doubt.").

We find no vagueness problem on these facts. Although Royal identifies some weaknesses in the methodologies used to identify crack cocaine, those imperfections did not taint the identification of the drugs in this case. For instance, even if crack cocaine cannot be visually distinguished from the rock form of cocaine salt, the government did not identify the drugs by sight alone. Rather, chemical tests established conclusively that Royal distributed cocaine base, not salt. And, we think it entirely proper that the government relied on Royal's words--his use of words like "rocked" and "cooked"--to determine that he possessed crack cocaine rather than some other form of cocaine base. So, we reject Royal's vagueness claim because the methods used to identify crack cocaine were adequate in this case. The fact that the identification techniques might prove insufficient under different circumstances is immaterial.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.