In the

# United States Court of Appeals
## For the Seventh Circuit

––––––––––––––––––

Nos. 21-2730 and 21-2989

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIE T. JOHNSON and ANESSA R. FIERRO,

*Defendants-Appellants.*

––––––––––––––––––

Appeals from the United States District Court for the
Western District of Wisconsin.
No. 20-cr-00134 — **James D. Peterson**, *Chief Judge*.

––––––––––––––––––

ARGUED MARCH 29, 2022 — DECIDED AUGUST 2, 2022

––––––––––––––––––

Before FLAUM, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges*.

FLAUM, *Circuit Judge*. Defendants-appellants Willie Johnson and Anessa Fierro were charged with arson under federal law after they participated in riots in Madison, Wisconsin, following the shooting of a Black man by a white police officer in Kenosha, Wisconsin. They moved to dismiss the indictment against them, arguing that the federal arson statute, 18 U.S.C. § 844(i), is unconstitutional because Congress overstepped its

Commerce Clause authority when it enacted the provision. The district court denied the motion. Johnson and Fierro now appeal after entering into guilty pleas preserving that right. For the following reasons, we affirm the decision of the district court holding that 18 U.S.C. § 844(i) is constitutional.

## I.    Background

The offense conduct in this case was largely caught on camera and is not disputed. In the summer of 2020, Anessa Fierro and her boyfriend, Willie Johnson, were living at the YWCA homeless shelter in downtown Madison, Wisconsin. After a white Kenosha police officer shot Jacob Blake, a young Black man, protests and riots broke out in Madison in the early morning hours of August 25, 2020. Fierro and Johnson had been drinking that night, and they eventually joined the throng of protesters.

Fierro and Johnson retrieved a baseball bat and a can of gasoline from a family member's work van (which the pair had borrowed for the weekend) and followed the crowd. After a few blocks, they descended on an office building. Johnson used the baseball bat to strike the building's windows, and Fierro poured gasoline along the front of it. Johnson and others lit the gasoline, and there was a burst of flames. After the two left, others hurled lit Molotov cocktails into the building as well.

The mob walked across the street to a second building, which housed a jewelry store with apartments above it. Fierro poured what remained of the gasoline along the storefront. Both made brief attempts to light the gasoline using a cigarette lighter, but they were unsuccessful and fled when the police arrived shortly thereafter.

The pair were indicted by a grand jury under the federal arson statute, 18 U.S.C. § 844(i). That statute provides:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both ….

18 U.S.C. § 844(i). The defendants moved to dismiss the indictment, arguing that the federal arson statute is facially unconstitutional because its enactment exceeded Congress's authority under the Commerce Clause. *See* U.S. Const. art. I, § 8, cl. 3.

The district court denied the motion. In doing so, it applied the Supreme Court's Commerce Clause decisions in *United States v. Lopez*, 514 U.S. 549 (1995), *United States v. Morrison*, 529 U.S. 598 (2000), and *Gonzales v. Raich*, 545 U.S. 1 (2005), as well as Supreme Court decisions interpreting § 844(i) both before and after *Lopez* and *Morrison* (*United States v. Russell*, 471 U.S. 858 (1985) and *United States v. Jones*, 529 U.S. 848 (2000)). The district court held that, as construed by the Supreme Court in *Russell* and *Jones*, the federal arson statute permissibly targets activities substantially affecting interstate commerce (as the Supreme Court explained that concept in *Lopez*, *Morrison*, and *Raich*) due to its jurisdictional requirement that the target of the arson be "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." It further emphasized that no other circuit has invalidated the federal arson statute. Significantly, every court

to consider the issue has concluded that the statute contains an adequate jurisdictional hook.

After the district court upheld the indictment, both defendants entered into conditional plea agreements that reserved their right to appeal the constitutional issue. The district court sentenced both Fierro and Johnson to the minimum term of five years' imprisonment, with three years of supervised release.[1] Fierro and Johnson now appeal.

## II.    Discussion

Fierro and Johnson concede that their conduct falls within the scope of 28 U.S.C. § 844(i), so we will sustain their convictions unless the statute is facially unconstitutional.

We review a district court's decision concerning the constitutionality of a statute de novo. *United States v. Wilson*, 73 F.3d 675, 678 (7th Cir. 1995). The task of "assessing the scope of Congress' authority under the Commerce Clause … is a modest one." *Raich*, 545 U.S. at 22–23. As the Supreme Court has instructed, "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *Morrison*, 529 U.S. at 607; *see also United States v. Harris*, 106 U.S. 629, 635 (1883)

---

[1] But for the statutory minimum, both defendants' Guidelines ranges would have been 37 to 46 months' incarceration. Fierro and Johnson point out that they could have been charged locally under Wisconsin's arson statute, Wis. Stat. § 943.02, which carries no minimum sentence and a maximum sentence of 40 years. In fact, they assert, most defendants charged with arson under the Wisconsin statute receive a sentence of probation, and only ten percent receive a sentence of between five- and twenty-years' incarceration.

(explaining that courts must "give effect to the presumption that congress will pass no act not within its constitutional power …. unless the lack of constitutional authority to pass an act in question is clearly demonstrated").

### A. The Supreme Court's Commerce Clause Jurisprudence

Our analysis of § 844(i)'s constitutionality begins with *Lopez*, where the Supreme Court struck down a statute enacted pursuant to Congress's Commerce Clause power for the first time in over fifty years. The case involved the Gun-Free School Zones Act of 1990, Pub. L. 101-647 § 1702, in which "Congress made it a federal offense 'for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone.'" *Lopez*, 514 U.S. at 551 (quoting 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V))). The Supreme Court invalidated the statute because it "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession [of the firearm] be connected in any way to interstate commerce." *Id.*

In doing so, the *Lopez* Court identified "three broad categories of activity that Congress may regulate under its commerce power." *Id.* at 558. "First, Congress may regulate the use of the channels of interstate commerce." *Id.* (citing *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964); *United States v. Darby*, 312 U.S. 100, 114 (1941)). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* (citing *Shreveport Rate Cases*, 234 U.S. 342 (1914); *S. Ry. Co. v. United States*, 222 U.S. 20 (1911); *Perez v. United States*, 402 U.S. 146, 150 (1971)). "Finally, Congress'

commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... *i.e.*, those activities that substantially affect interstate commerce." *Id.* at 558–559 (citing *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). Only the third category—activities having a substantial relation to interstate commerce—is relevant to this appeal.[2]

Next, in *Morrison*, the Supreme Court struck down 42 U.S.C. § 13981, which, as part of the Violence Against Women Act of 1994, Pub. L. No. 103-322 § 40302, provided a federal civil remedy for the victims of gender-motivated violence. 529 U.S. at 601–02. The Court concluded that Congress exceeded its authority under the Commerce Clause when enacting § 13981 because "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Id.* at 618.

In reaching that holding, the Supreme Court set forth four "significant considerations" relevant to determining whether a statute is permissible under the substantial effects category. 529 U.S. at 609. First, a court must consider whether the statute regulates a commercial or economic activity. "Where economic activity substantially affects interstate commerce,

---

[2] The government also argues that § 844(i) "protect[s] the *instrumentalities* of interstate commerce," *see Lopez*, 514 U.S. at 558 (emphasis added), because the statute encompasses the destruction of vehicles. Fierro and Johnson, however, were indicted for the attempted arson of buildings, not vehicles. As discussed below, we conclude that Congress permissibly criminalized the arson of buildings pursuant to its power to "regulate those activities having a substantial relation to interstate commerce," *see id.* at 558–59, so we need not separately evaluate the arson of vehicles.

legislation regulating that activity will be sustained." *Id.* at 610 (quoting *Lopez*, 514 U.S. at 560).

The second important consideration is whether the statute contains an "express jurisdictional element which might limit its reach to a discrete set of [activity] that [has] an explicit connection with or effect on interstate commerce." *Id.* at 611–12 (quoting *Lopez*, 514 U.S. at 562).

Third, a court should consider whether the statute or its legislative history contains express congressional findings regarding the effects of the activity on interstate commerce. *Id.* at 612. "While Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce, … the existence of such findings may enable [courts] to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye." *Id.* (some alterations in original) (citations and internal quotation marks omitted). Nonetheless, "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Id.* at 614.

The fourth and final consideration is whether the link between the activity and a substantial effect on interstate commerce is attenuated. *Id.* at 612. Notably, if the government's argument in support of the constitutionality of the statute "seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce" such that the "reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has

substantial effects on employment, production, transit, or consumption," then the link is too attenuated. *Id.* at 615.

Five years after articulating these four factors in *Morrison*, the Supreme Court decided *Gonzales v. Raich*, 545 U.S. 1. In that case, the petitioners brought an as-applied challenge to the Controlled Substances Act, Pub. L. No. 91-513 (1970) (codified at 21 U.S.C. § 801 *et seq.*), through which Congress aimed to "conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Raich*, 545 U.S. at 12. Following federal agents' destruction of one petitioner's privately cultivated medical marijuana plants, the petitioners sought to enjoin the enforcement of the Controlled Substances Act to the extent it would prevent them from possessing, obtaining, or manufacturing cannabis for their personal medical use in compliance with California law. *Id.* at 7. Although the Controlled Substances Act's reach is broad, the Supreme Court upheld its application to the petitioners' "purely local activities," reasoning that "[w]hen Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class." *Id.* at 17 (internal quotation marks omitted).

Most importantly for our purposes, the Supreme Court in *Raich* did not strictly rely on the *Morrison* factors to sustain the Controlled Substances Act. *Id.* at 15–33. Instead, the Court primarily analogized the statutory scheme at issue, regulating the market for drugs, with the one it upheld in *Wickard v. Filburn*, 317 U.S. 111 (1942), which regulated the market for wheat. *Raich*, 545 U.S. at 17. The Supreme Court discussed two of the four *Morrison* considerations—whether the Controlled Substances Act regulated economic activity, as well as Congress's legislative findings to that effect—but it did not

explicitly analyze the remaining two factors—the existence of a jurisdictional element and whether the link to commerce was too attenuated. *Id.* at 15–33. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 551–58 (2012) (holding that the Patient Protection and Affordable Care Act of 2010 was not a valid exercise of the Commerce Clause power after focusing solely on whether it regulated "economic activity" without discussing the remaining *Morrison* factors). Based on this, we observe that the considerations articulated by the Supreme Court in *Morrison* need not be applied mechanically, and no single factor is dispositive.

We now turn to 18 U.S.C. § 844(i) and evaluate its constitutionality based on these considerations.

### B. Application to 18 U.S.C. § 844(i)

Our review of the four considerations laid out in *Morrison* reveals that the federal arson statute falls within Congress's authority to regulate interstate commerce. We discuss each factor in turn.

#### 1. Economic Activity

In this case, the district court concluded that "arson is typically economically motivated, and setting fire to property actively employed for commercial purposes is inherently an economic activity in the sense that it directly affects economic transactions." Fierro and Johnson attack this conclusion as inconsistent with *Lopez*, arguing that "the activity itself must be economic," not its motivation or effect. They argue that this is the "central factor" of the *Lopez* analysis. On their view, if the activity is not economic, then Congress cannot regulate it under the "substantial effects" category of its Commerce Clause power.

We need not decide whether, as the district court found, an "economic[] motivat[ion]" suffices under *Lopez*, because we disagree with the defendants' implication that this factor is dispositive. Although the Supreme Court wrote in *Morrison* that "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature," significantly, it also stated that it was "not adopt[ing] a categorical rule against aggregating the effects of any noneconomic activity." 529 U.S. at 613.

In fact, the Supreme Court has previously sustained federal statutes that criminalize noneconomic activity as long as the statute contained an adequate jurisdictional element. On this front, it is useful to contrast the Supreme Court's decision in *Lopez*, which struck down the Gun-Free School Zones Act, with its treatment of 18 U.S.C. § 922(g) (and its predecessor, 18 U.S.C. § 1202), commonly known as the "felon-in-possession statute," *see United States v. Lemons*, 302 F.3d 769, 770 (7th Cir. 2002). The felon-in-possession statute is an illuminating comparator to the Gun-Free School Zones Act because both criminalize the "mere possession" of a firearm. *See Lopez*, 514 U.S. at 562 (contrasting §§ 922(g) and 922(q)).

When interpreting the felon-in-possession statute's predecessor, 18 U.S.C. § 1202(a), which punished certain categories of person, including those "convicted ... of a felony," who "receive[d], possesse[d], or transport[ed] in commerce or affecting commerce … any firearm," the Supreme Court held that the postpositive modifier "in commerce or affecting commerce" applied to the possession and receipt of a firearm, in addition to its transportation. *United States v. Bass*, 404 U.S. 336, 337 n.1, 349–50 (1971). While this decision was nominally one of statutory—not constitutional—dimensions, the

Supreme Court noted that "[a]bsent proof of some interstate commerce nexus in each case, § 1202(a) dramatically intrudes upon traditional state criminal jurisdiction." *Id.* at 350. The constitutional overtones are clear. *See Lemons*, 302 F.3d at 771 (noting that "the constitutional question was not far from the Court's mind in either [*Bass* or *Scarborough*]"); *see also United States v. Chesney*, 86 F.3d 564, 571 (6th Cir. 1996) ("When the Court construes a statute to avoid a constitutional question, the Court's construction must itself be constitutional."). The Supreme Court also commented that "the inclusion of such a phrase mirror[s] the approach to federal criminal jurisdiction reflected in many other federal statutes." *Bass*, 404 U.S. at 341 (alteration in original) (internal quotation marks omitted).

Additionally, when interpreting the modern version of the felon-in-possession statute, 18 U.S.C. § 922(g), the Supreme Court acknowledged that "Congress was not particularly concerned with the impact on commerce except as a means to insure the constitutionality of [the statute]." *Scarborough v. United States*, 431 U.S. 563, 575 n.11 (1977). Section 922(g) states that it "shall be unlawful" for certain categories of person, including those convicted of felonies, "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g). In *Scarborough*, the Supreme Court considered the sufficiency of the evidence on the jurisdictional element and held that § 922(g) required the government to prove "no … more than the minimal nexus that the firearm have been, at some time, in interstate commerce." *Id.* at 575. Although, again, the decision was one of statutory interpretation, it has been viewed as determining the "*constitutionally* minimal" nexus with

commerce necessary to sustain a criminal statute under Congress's Commerce Clause power. *See United States v. Lewis*, 100 F.3d 49, 52–53, (7th Cir. 1996) (emphasis added) (noting that "the [Supreme] Court's evident belief that a minimal nexus to interstate commerce [in *Scarborough*] ... was, indeed, sufficient to avoid [the constitutional] inquiry altogether, suggests that no more is necessary to satisfy the Commerce Clause [after *Lopez*]" and relying on *Scarborough* to hold that 18 U.S.C § 922(g) was constitutional).

In *Lopez*, the Supreme Court reapproved its decision in *Bass* (and by extension, *Scarborough*). It expressly noted that a jurisdictional hook—even the minimal one in the felon-in-possession statute—could bring the regulation of noneconomic activity within the purview of Congress's Commerce Clause authority. *Lopez*, 514 U.S. at 562. When discussing the Gun-Free School Zones statute's lack of jurisdictional requirement tying possession of a gun in a school zone to interstate commerce, the *Lopez* Court wrote:

> [Section] 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce. For example, in [*United States v. Bass*], the Court interpreted former 18 U.S.C. § 1202(a) …. to require an additional nexus to interstate commerce both because the statute was ambiguous and because "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." … The Court thus interpreted the statute to reserve the constitutional question whether Congress could

> regulate, without more, the "mere possession" of firearms…. Unlike the statute in *Bass*, [the Gun-Free School Zones Act] has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.

*Lopez*, 514 U.S. at 561–62 (citations omitted). In other words, the jurisdictional hook in the felon-in-possession statute required the government "to prove exactly what *Lopez* found missing …." *Lewis*, 100 F.3d at 51 (quoting *United States v. Bell*, 70 F.3d 495, 498 (7th Cir. 1995)) (collecting cases in agreement from the Second, Third, Fifth, Sixth, Eighth, Ninth, and Tenth Circuits).

Thus, the federal arson statute at issue here, 18 U.S.C. § 844(i), will be constitutional if its jurisdictional hook as written will successfully "limit [the statute's] reach to a discrete set of [arsons] that … have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562; *see also United States v. Odom*, 252 F.3d 1289, 1296 (11th Cir. 2001) ("Section 844(i) regulates non-economic activity, arson. The government, therefore, must show that this arson affects interstate commerce by showing how the function of this particular building was used in or affected interstate commerce."); *United States v. Hill*, 927 F.3d 188, 205–06 (4th Cir. 2019) (stating in dicta that federal arson statute complies with Commerce Clause "*not* because robbery and arson are 'inherently economic,'" but because it contains a jurisdictional element that limits its reach to arsons that interfere with interstate commerce).

We turn next to that question.

### 2. *Legislative History*

In order to properly understand § 844(i)'s jurisdictional element, it is helpful to start with its legislative history and the Supreme Court's treatment of it. In an attempt to demonstrate that "Congress went out on a limb when drafting § 844(i)…. [and] went too far," Fierro and Johnson point out that some congressional representatives raised concerns about the scope of § 844(i) in committee. That debate addressed a previous version of the statute, which would have criminalized the destruction by certain means of any property "used for business purposes by a person engaged in commerce or in any activity affecting commerce." Fierro and Johnson recount one exchange in particular, between the Judiciary Committee Chairman and a representative from Ohio:

> Mr. WYLIE. I think the bombing of any building should be included…. As far as I am concerned we could leave out the word "used for business purposes," and it would help the situation.

> The CHAIRMAN. You feel we should broaden it? … Has Congress the power to broaden it to cover a private dwelling?

> Mr. WYLIE. I think so…. I feel Congress can in and of itself make a finding that a specific act involves interstate commerce if it so desires.

> The CHAIRMAN. We can make a declaration but will the Supreme Court sustain us?

> Mr. WYLIE. I do not think they have overruled Congress on this question since the 1930's, have they? I do not know that they have.

*Explosives Control: Hearing on H.R. 17154, H.R. 16699, H.R. 18573 and Related Proposals Before Subcommittee No. 5 of the House Committee on the Judiciary*, 91st Cong., 2d Sess. 300–01 (1970) (statement of Rep. Chalmers P. Wylie, Ohio).

The Supreme Court evaluated this legislative history in *Russell v. United States*, where "[t]he question presented [wa]s whether 18 U.S.C. § 844(i) applies to a two-unit apartment building that is used as rental property"—the type of building the defendant had been convicted of trying to burn down. 471 U.S. 858, 858 (1985). The Court sustained the conviction after using the legislative history to help interpret the statute's scope. *Id.* at 862.

Specifically, after acknowledging the comments from Mr. Wylie that Fierro and Johnson now highlight, *see id.* at 861 n.7, the Supreme Court emphasized that even after the words "for business purposes" were removed from the statute, the House Report still stated that the law was directed to "business property." H.R. Rep. No. 91-1549, at 69–70 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4046 (noting that "[w]hile this provision is broad, the committee believes that there is no question that it is a permissible exercise of Congress [*sic*] authority to regulate and to protect interstate and foreign commerce"); *see also Russell*, 471 U.S. at 861 & n.8. The Court held that this "legislative history suggests that Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home." *Russell*, 471 U.S. at 862.

Clearly, this is not the kind of legislative history identified as useful in *Lopez* and *Morrison*. It merely reiterates Congress's belief in § 844(i)'s constitutionality, and it does not "enable us to evaluate the legislative judgment that the activity in

question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye." *Morrison*, 529 U.S. at 612 (alterations in original) (quoting *Lopez*, 514 U.S. at 563). Accordingly, it carries little weight in our analysis. Nonetheless, it is worth noting that the Supreme Court in *Russell* did not raise any constitutional concerns based on this legislative history; it simply determined that the statutory "reference to 'any building … used … in any activity affecting interstate or foreign commerce' expresses an intent by Congress to exercise its full power under the Commerce Clause." *Id.* at 859 (quoting 18 U.S.C. § 844(i)).

### 3. *Jurisdictional Element*

With this legislative history in mind, we turn to the crucial question in this case: whether § 844(i)'s jurisdictional element "is sufficiently tied to interstate commerce" such that the statute was validly enacted "in pursuance of Congress' power to regulate interstate commerce." *Morrison*, 529 U.S. at 612–13.

The Supreme Court has twice interpreted § 844(i)'s jurisdictional hook. First, in *Russell*, the Court held that—whatever Congress's intent about the scope of the statute—"[b]y its terms, … the statute only applies to property that is 'used' in an 'activity' that affects commerce." 471 U.S. at 862. In that case, the Supreme Court found that it need not evaluate the statute's outer limits (the constitutional question was not presented) since "[t]he rental of real estate is unquestionably" an "'activity' that affects commerce" within the meaning of the statute. *Id.* Accordingly, the Supreme Court upheld the defendant's conviction for attempted arson of a rental property.

The Supreme Court had another occasion to interpret 18 U.S.C. § 844(i) in *Jones v. United States*, 529 U.S. 848 (2000),

which was decided after *Morrison*. In *Jones*, the defendant was convicted of arson for using a Molotov cocktail to severely damage a private home. The Supreme Court granted certiorari on the question of "[w]hether, in light of [*Lopez*], and the interpretive rule that constitutionally doubtful constructions should be avoided, … 18 U.S.C. § 844(i) applies to the arson of a private residence; and if so, whether its application to the private residence in the present case is constitutional." *Id.* at 852 (citations omitted). The Supreme Court held that the words "used in" in the statute "requir[e] that the damaged or destroyed property *must itself* have been used in commerce or in an activity affecting commerce," and it was not sufficient that the "*damage or destruction* [of the property] might affect interstate commerce." *Id.* at 854 (emphasis added) (quoting *United States v. Mennuti*, 639 F.2d 107, 110 (2d. Cir. 1981)). Based on this, the Supreme Court set forth a two-part test for determining whether a particular property was "used in" commerce: first, a court must inquire "into the function of the building itself," and then it must "determin[e] … whether that function affects interstate commerce." *Id.* (citation omitted).

Turning to the case before it, the Supreme Court rejected the government's argument that the statute should reach the private residence damaged in that case and vacated the defendant's conviction. *Id.* at 855–57. The government proffered three ways in which the private residence was "used in" commerce: first, the homeowner "used" the residence as collateral to secure a mortgage from an out-of-state lender; similarly, the home was "used" to obtain a casualty insurance policy from an out-of-state insurer; and, finally, the homeowner "used" the residence to receive natural gas from out-of-state sources. *Id.* at 855. The Supreme Court found that this was not enough, holding that "used in" is "most sensibly read to mean

active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Id*.

The Supreme Court noted that, under the government's reading of the statute, "hardly a building in the land would fall outside the federal statute's domain" because "[p]ractically every building in our cities, towns, and rural areas is constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate connection, financed or insured by enterprises that do business across state lines, or bears some other trace of interstate commerce." *Id.* at 857. Invoking the canon against surplusage, the Supreme Court emphasized that "[i]f such connections sufficed to trigger § 844(i), the statute's limiting language, 'used in' any commerce-affecting activity, would have no office." *Id.* To illustrate the role "used in" plays, the Court contrasted these passive connections to commerce with the rental property at issue in *Russell*, or a hypothetical residence that "serve[s] as a home office or the locus of any commercial undertaking." *Id.* at 856.

After highlighting the "concerns brought to the fore in *Lopez*," the Supreme Court explicitly stated that its "reading of § 844(i) is in harmony with the guiding principle that 'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.'" *Id.* at 857–58 (quoting *United States ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909)). This language indicates that the Supreme Court believed its interpretation of § 844(i)'s jurisdictional hook passed

constitutional muster.[3] *See Chesney*, 86 F.3d at 571 ("When the Court construes a statute to avoid a constitutional question, the Court's construction must itself be constitutional.").

Our decisions applying *Jones* in this Circuit show that the jurisdictional test the Supreme Court set forth is not merely perfunctory. For example, in *United States v. Craft*, 484 F.3d 922 (7th Cir. 2007), we applied the *Jones* test to arson convictions involving multiple rental properties, as well as a property used as a clubhouse for local members of the Hell's Angels motorcycle club. We upheld the convictions pertaining to the rental properties but invalidated the conviction related to the motorcycle clubhouse. *Id.* at 927–29. The government argued that the clubhouse was "used in" interstate commerce because its members paid dues, which were occasionally used to reimburse members for trips taken across state lines. *Id.* at 929. We held that "any affect that those dues had on interstate commerce was too passive, too minimal, and too indirect to place the clubhouse property in § 844(i)'s reach." *Id.* (citing *Odom*, 252 F.3d at 1296-97, and *United States v. Rea*, 223 F.3d 741, 743 (8th Cir. 2000), which held that churches' out-of-state

---

[3] Justice Thomas, joined by Justice Scalia, concurred separately to note:

> In joining the Court's opinion, I express no view on the question whether the federal arson statute, 18 U.S.C. § 844(i) (1994 ed., Supp. IV), as there construed, is constitutional in its application to all buildings used for commercial activities.

*Jones*, 529 U.S. at 860 (Thomas, J., concurring). This was the entirety of the concurrence, which may imply that Justices Thomas and Scalia were prepared to strike down § 844(i) in its entirety. Nonetheless, in the more than twenty years since *Jones* was decided, the Supreme Court has not done so.

donations and purchases were insufficient to find that the church buildings were "used in" interstate commerce).

Thus, it is clear that § 844(i)'s jurisdictional element, as interpreted in *Jones*, "limit[s] [the statute's] reach to a discrete set of [arsons] that … have an explicit connection with or effect on interstate commerce." *See Morrison*, 529 U.S. at 611–12 (quoting *Lopez*, 514 U.S. at 562); *see also United States v. Tocco*, 135 F.3d 116, 123 (2d Cir. 1998) (holding that "in light of the fact that, unlike the statute in *Lopez*, § 844(i) does contain a jurisdictional element, *Lopez* did not elevate the government's burden in establishing jurisdiction in a federal arson prosecution," and "we see no reason to conclude … that *Lopez* overruled the Court's holding in *Russell*"); *United States v. Laton*, 352 F.3d 286, 297 (6th Cir. 2003) (concluding that "[t]he prominent issue raised by this appeal is not constitutional in scope" because "[u]nlike [the statute at issue in *Lopez*], § 844(i) does contain a jurisdictional element, and we accordingly follow the lead of previous post-*Lopez* decisions, which focus on interpreting the words of similarly phrased jurisdictional elements," and applying the *Jones* test); *Rea*, 300 F.3d at 963 (reviewing the defendants' conviction for burning down a church, holding that "[w]e do not find *Lopez*'s analysis applicable due to … § 844(i)'s express jurisdictional element," and vacating the conviction because the church was not "use[d] in" interstate commerce); *United States v. Mahon*, 804 F.3d 946, 953 (9th Cir. 2015) (rejecting a facial challenge to § 844(i) because "[u]nlike the statutes in *Morrison* and *Lopez*, § 844(i) has the necessary jurisdictional element"); *United States v. Garcia*, 768 F.3d 822, 829–31 (9th Cir. 2014) (concluding that "nothing in *Morrison* undermined *Russell*'s *per se* rule that damage to a rental apartment building satisfies the jurisdictional provisions of 18 U.S.C. § 844(i)," and holding that it must "apply

this binding precedent in affirming [the defendant's] convictions" based on damage to rental buildings caused by a pipe bomb). *Cf. United States v. Forsythe*, 711 F. App'x 674, 678–80 (3d Cir. 2017) (construing *Russell* as holding that "Congress constitutionally could and did regulate the destruction of rental property in § 844(i)" and stating in dicta that "this case is decidedly different from … *Lopez* and *Morrison*, … because as *Russell* explained, there cannot be any doubt that renting property is economic activity and because § 844(i) has a jurisdictional element"); *Odom*, 252 F.3d at 1293 (declining to reach the question whether § 844(i) was constitutional because the church that the defendants burned down was not "used in" interstate commerce pursuant to *Jones*).

### 4. Is the Link to Interstate Commerce Too Attenuated?

Finally, we consider whether "the link between [arson] and a substantial effect on interstate commerce [i]s attenuated." *Morrison*, 529 U.S. at 612. Recall that a link will be too attenuated if the chain of reasoning "would permit Congress to 'regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce.'" *Id.* at 612–13 (quoting *Lopez*, 514 U.S. at 564).

This factor is easily disposed of; as discussed above, the Supreme Court in *Jones* already interpreted § 844(i)'s jurisdictional hook to avoid a link that is too attenuated to pass constitutional muster. In that decision, which was issued just a few days after *Morrison*, the Supreme Court rejected the government's proposed reading of the statutory term "used in" because the government's focus on whether the building was "constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate

connection, financed or insured by enterprises that do business across state lines, or bears some other trace of interstate commerce," would sweep "[p]ractically every building … in the land" within § 844(i)'s scope. *Jones*, 529 U.S. at 857. In rejecting this interpretation, the Supreme Court addressed the "concerns brought to the fore in *Lopez*," and it expressly invoked the canon of constitutional avoidance. *Id.* at 857–58. The Court concluded, "§ 844(i) is not soundly read to make virtually every arson in the country a federal offense. We hold that the provision covers only property currently used in commerce or in an activity affecting commerce." *Id.* at 859. By using this interpretation of the statute's scope in its application of the constitutional avoidance canon, the Court necessarily concluded that such an interpretation was constitutionally sound. *See Chesney*, 86 F.3d at 571 ("When the Court construes a statute to avoid a constitutional question, the Court's construction must itself be constitutional.").

Therefore, as construed by the Supreme Court's decision in *Jones*, § 844(i)'s link to interstate commerce is not too attenuated.

\* \* \*

After considering each factor identified by the Supreme Court in *Morrison*, we find that § 844(i) was validly enacted pursuant to Congress's authority under the Commerce Clause.

### III.    Conclusion

For the foregoing reasons, the district court's decision denying Fierro and Johnson's motion to dismiss the indictment is AFFIRMED.